OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Lou Ellen Key, filed January 15, 2008. On July 24, 2007, Key was charged by way of complaint with soliciting, in violation of R.C. 2907.24(A), a misdemeanor of the third degree, and with loitering, in violation *Page 2 
of R.C. 2907.241(A)(1), a misdemeanor of the third degree. On July 26, Key pled not guilty to both charges. Following a bench trial in Dayton Municipal Court, on November 8, 2007, Key was found guilty of soliciting and not guilty of loitering. Key received a 60 day jail sentence, she received credit for one day, and the balance was suspended on the condition that she commit no further violations of this nature and obtain HIV testing. Key was also placed on supervised probation for a period not to exceed two years.
 {¶ 2} The events giving rise to this matter began on July 23, 2007, when Detective Raymond St. Clair, of the City of Dayton Police Department's Vice Crimes Unit, was on patrol at around 8:15 p.m, in plain clothes and in an unmarked car. St. Clair observed Key on the 3400 block of East Third Street, walking with another female, Carolyn Klosterman. St.Clair was traveling westbound, and his attention was drawn to Klosterman when she began exposing her breasts to passing cars as the women walked east. St. Clair testified that Key was intoxicated, and she was wearing "a blue shirt and some blue pants."
 {¶ 3} St. Clair advised Detective Thomas Harshman, another Vice Unit officer on duty, of the women's location, and Harshman approached in a green Ford Ranger pick up truck. As he proceeded past them, eastbound on Third Street, both women yelled "Hey," and "Stop," to him. Harshman "drove by and made a right which would take me southbound on Garland. I went through a little alley that brought me back out to Sperling, * * * Then I pulled to the curb and parked and at that time the first female Klosterman ran over to my truck and opened the door and got in without being asked to do so." Harshman observed Key still standing on the southeast corner of Third and Sperling. Klosterman told Key to get into Harshman's truck, and Key climbed into the rear jumpseat area. Harshman protested that there was not enough room *Page 3 
for all three of them in the vehicle.
 {¶ 4} Harshman testified over objection that Klosterman told Key that she was going to provide oral sex to Harshman for twenty dollars and asked Key if she "wanted some." Key stated, "I get six hundred fifty dollars for a blow job." Harshman testified that he stated, "I don't have six hundred and fifty dollars, how about twenty?" Key then responded, "Okay." Harshman testified that the women told him they wanted to get some beer, and he told them he would take them to a drive-thru. The women said they wanted to go to Bellbrook and asked Harshman to take them. St.Clair then stopped the vehicle, and both women were arrested. Harshman testified that yelling, "Hey," and "Stop," at passing cars is a common street prostitute practice to lure customers. Harshman testified that Key solicited him for sex in his truck.
 {¶ 5} Key testified on her own behalf. According to Key, on July 23, 2007, she had gotten off work at 28 North Irwin Street, which is off of Third Street, and she was walking home in an easterly direction. Key ran into Klosterman, a friend she grew up with, standing outside Collins Bar having a cigarette. The women began to chat, and Key noted that Klosterman was intoxicated. Key maintained she wanted to take Klosterman home with her and get her off the street. As they began to walk, Klosterman began yelling and exposing her breasts to traffic. Key was embarrassed, tried to get her under control, and then began to walk away from her.
 {¶ 6} Key maintained Harshman pulled over, and Klosterman yelled to her, "Hey Lou, the guy knows my brother. He's gonna give a ride to your house." Key testified that she got into the car with Klosterman. According to Key, Harshman "acted like he knew her brother and um I got in the truck. I normally wouldn't of but I didn't want to leave my girlfriend alone and * * * I just figured it was a couple of blocks." *Page 4 
 {¶ 7} Key testified that she was not intoxicated. She stated that Harshman asked her for oral sex a few times. According to Key, Harshman told her that Klosterman offered him oral sex for twenty dollars. Key stated to Harshman, "I work for a living always have and * * * come from a different kind of family." Key testified that she has never been arrested or convicted. She further maintained that Harshman kept asking her about oral sex, and she stated that she "got really mad and I made up a number just so he would * * * take us to my house." Key testified that she was being sarcastic. Key testified that she never agreed to give Harshman oral sex for $20.00. Harshman drove west, away from the direction of Key's home, until the arrest occurred, according to Key. At the time of the arrest, Key testified that she had about $190.00 on her person, along with an uncashed paycheck. Key testified that she did not wave Harshman over and that she did not solicit him.
 {¶ 8} Key asserts two assignments of error. Her first assignment of error is as follows:
 {¶ 9} "THE TRIAL COURT ERRED IN CONVICTING APPELLANT AS THE EVIDENCE ELICITED AT TRIAL WAS INSUFFICIENT, AS A MATTER OF LAW, TO SUSTAIN A CONVICTION OF THE CHARGE OF SOLICITING."
 {¶ 10} "In reviewing a claim of insufficient evidence, `[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; see, also, State v.Thompkins (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541." State v.McKnight, 107 Ohio St.3d 101, 112, 837 N.E.2d 315, 2005-Ohio-6046, ¶ 70.
PGPage 5
 {¶ 11} R.C. 2907.24(A) provides, "No person shall solicit another to engage with such other person in sexual activity for hire." "Courts have defined `solicit' in similarly worded statutes as `to entice, urge, lure or ask.'" (internal citation omitted). City of Columbus v. Myles, Franklin Ap. No. 04AP-1255, 2005-Ohio-3933; 4 Ohio Jury Instructions (1997), Section 507.24.
 {¶ 12} Key relies upon State v. Swann (2001), 142 Ohio App.3d 88,753 N.E.2d 984, and she argues that she did not solicit Harshman but rather was solicited by him. In Swann, a Cincinnati police officer was patrolling for evidence of prostitution. A second officer was hidden in the trunk of the unmarked car. Upon seeing Swann walking down the street, the officer pulled to the curb and engaged Swann in conversation. The officer then invited Swann into his car, where their discussion initially was not of a sexual nature. The officer then offered Swann crack or money for oral sex, and they finally agreed on a price of $15.00. At that point, the second officer in the trunk emerged and arrested Swann.
 {¶ 13} The First District determined that "Swann did not `entice, urge, lure or ask' the officer for anything. She simply agreed to his suggestion." In reversing the trial court's judgment and discharging Swann from further prosecution, the First District relied upon State v.Howard (1983), 7 Ohio Misc.2d 45, 455 N.E.2d 29. In Howard, an undercover policeman approached Howard near the curb and asked him if he was "dating." Howard asked if the officer had any money, and the officer indicated he did, and he asked Howard what he would "do." Howard responded that he would "do" anything. The officer asked him if he would perform oral sex, and after Howard agreed and got into the car, he was arrested.
 {¶ 14} The court determined, "the defendant in this case did not entice, urge, lure or ask *Page 6 
for money in return for sexual performance. What defendant did was agree to what the officer had suggested and as such he cannot be found guilty of soliciting, an offense unlike some other offenses where entrapment is raised, where the crime is in the asking."
 {¶ 15} We find Columbus v. Myles to be on point. In Myles, two detectives were investigating street prostitution in an undercover vehicle in civilian clothes. Around 1:00 a.m. the detectives observed Myles, wearing a sheer dress, engage them in extended eye contact as they drove past. The officers stopped their vehicle 75 feet from Myles, and she approached the vehicle and asked the officers, "What are you guys looking for?" One of the officers indicated he wanted someone to ride with him. Myles responded that she did not "ride in vehicles," and she invited the officers to her house on a nearby street. One officer asked Myles what they would be able to do when they arrived at her house, and Myles asked them how much money they had. One detective responded, "`Does pussy for $20 sound okay?'" Myles agreed and indicated to the other officer that the $20 would include him as well. As the threesome made their way to Myles' home, the officers arrested Myles. Myles resisted arrest, and in the course of the struggle, one of the officers noticed that Myles was not wearing any underwear.
 {¶ 16} The Tenth District distinguished Myles' conduct from "the acquiescing defendants in Swann and Howard," noting that Myles "lured and enticed the detectives by approaching them on the street at 1 a.m. wearing a sheer dress and no underwear. Additionally, prior to approaching the detectives, appellant engaged them in extended eye contact, a common street prostitute practice. Appellant continued to lure, entice, and urge the detectives by initiating the conversation and asking: `What are you guys looking for?' and by inviting them to her place." Id., ¶ 27-28. *Page 7 
 {¶ 17} The Tenth District further noted that Myles brought up the subject of money, and having "steered the conversation in this manner, appellant * * * stated that the $20 would cover both detectives." Id., ¶ 29. The court noted that, while Myles "did not explicitly ask the detectives to engage in sex for hire, and although the detective, not appellant, suggested the particular sexual activity and price, * * * such explicit conduct is not required to establish soliciting so long as the defendant's conduct, as here, conforms to the alternative means of soliciting, i.e. luring, urging or enticing another into sex for hire." Id., at ¶ 30.
 {¶ 18} As in Myles, Key made the initial contact with Harshman by yelling "Hey," and "Stop," along with Klosterman. Klosterman, Keys' companion, had been exposing her breasts to passing cars. Key entered Harshman's vehicle after Klosterman, and she remained there, despite being told by Harshman that there was not enough room for the three occupants. When Klosterman informed Key that she intended to perform oral sex on Harshman, asking Key if she wanted to participate, Key did not respond in the negative but stated that her rate for the service was $650.00. Key then agreed to the price of $20.00.
 {¶ 19} Based upon these facts, we determine Key's participation in the criminal act of soliciting Harshman for sex for hire is not only demonstrated by Key's words in yelling to Harshman, but also by her presence, companionship with Klosterman and conduct before and after the initial solicitation by Klosterman. Their common purpose is clearly demonstrated not just by her conduct, but by her own suggestion of a dollar amount for a particular sex act and agreeing to a lower price.
 {¶ 20} Finally, we note that although Key was charged as a principal, her conduct and words clearly demonstrated complicity to the crime of solicitation, and the law permits her to be *Page 8 
charged as a principal. R.C. 2923.03(F).[1]
 {¶ 21} Having reviewed the evidence in a light most favorable to the State, we conclude that any rational trier of fact could have found the elements of solicitation proven beyond a reasonable doubt. Accordingly, Key's first assignment of error is overruled.
 {¶ 22} Key's second assignment of error is as follows:
 {¶ 23} "THE CONVICTION OF THE DEFENDANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 24} "When an appellate court analyzes a conviction under the manifest weight of the evidence standard it must review the entire record, weigh all of the evidence and all the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (Internal citations omitted). Only in exceptional cases, where the evidence `weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." State v. Dossett, Montgomery App. No. 20997,2006-Ohio-3367, ¶ 32.
 {¶ 25} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. State v.DeHass (1997), 10 Ohio St.2d 230, 231, 227 N.E.2d 212. "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is *Page 9 
against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288.
 {¶ 26} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict.State v. Bradley (Oct. 24, 1997), Champaign App. No. 97-CA-03.
 {¶ 27} Having reviewed the entire record, weighed all of the evidence and all the reasonable inferences, considered the credibility of the witnesses and determined whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice, we cannot conclude that Key's conviction must be reversed and a new trial ordered. As discussed above, St. Clair observed Key and Klosterman walking down Third Street together, and he observed Klosterman bearing her breasts to passing cars, conduct Key's testimony did not dispute. When Harshman passed the women, they together beckoned to him to stop, conduct consistent with solicitation and prostitution. It was undisputed that both Klosterman and Key then entered Harshman's truck after he passed them and stopped. In response to an inquiry from Klosterman, Key then proposed oral sex, quoting a price of $650.00.
 {¶ 28} While Key testified that she was trying to get an intoxicated Klosterman off the street upon encountering her on her way home from work, that she climbed into Harshman's truck to protect Klosterman, and that Harshman kept asking her about sexual favors, the court *Page 10 
clearly rejected Key's version of events.
 {¶ 29} Deferring to the factfinder's assessment of witness credibility, we cannot say that the court clearly lost its way in convicting Key of solicitation. The officers, whom the court clearly believed, described conduct consistent with solicitation; Key lured Harshman, entered his truck, and negotiated a price for a sexual favor. Since it is not patently apparent that the court lost its way in arriving at a verdict, we will not substitute our judgment on the issue of witness credibility for that of the trial court. Since Key's conviction for solicitation is not against the manifest weight of the evidence, Key's second assignment of error is overruled. The judgment of the trial court is affirmed.
WOLFF, J. and GRADY, J., concur.
Copies mailed to:
Edward C. Utacht II Susan F. Souther Charles L. Grove Hon. Bill C. Littlejohn
[1] "Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense." *Page 1